

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

WK:GK
F. #2019R00795

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

August 7, 2020

<u>By E-mail</u>

The Honorable Steven M. Gold
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

    Re: United States v. Gibson Winters
       <u>Criminal Docket No. 20-17 (FB)</u>

Dear Judge Gold:

  The government respectfully submits this letter in support of its application for the entry of a permanent order of detention pending trial for defendant GIBSON WINTERS. The defendant is both a flight risk and a danger to the community, and no combination of conditions can secure his appearance at trial and the safety of the community.

I.  <u>The Defendant's Crimes</u>[1]

  A. <u>Narcotics Trafficking</u>

  The United States Department of Homeland Security, Homeland Security Investigations ("HSI") and the New York City Police Department ("NYPD") have been investigating criminal activity related to the Rollin 60s set of the Crips street gang of which the defendant is a member. The investigation has revealed, among other things, that the defendant has engaged in the trafficking of crack cocaine in and around the Crown Heights neighborhood of Brooklyn, New York. The defendant is specifically charged with one count of conspiring to distribute and possessing with intent to distribute at least 28 grams of a substance containing cocaine base, and one count of distributing and possessing with intent to distribute at least 28 grams of cocaine base.

---

[1]  The proffer of facts set forth herein does not purport to provide a complete statement of all facts and evidence of which the government is aware or that it will seek to introduce at trial.

Between June 2019 and September 2019, the defendant participated in at least 20 sales of crack cocaine, involving a total of more than 28 grams of a substance containing cocaine base, for which he and his criminal associates received more than $4,600 in payment. The majority of these sales consisted of hand-to-hand transactions carried out by the defendant directly. The transactions were video and audio recorded. By way of example, below are screen shots of Gibson exchanging crack cocaine for cash on public streets in Brooklyn in June, July, August and September 2019.









The defendant's membership in and affiliation with the Rollin 60s set of the violent Crips street gang is documented on social media. For example, public portions of the defendant's Instagram account (mr_wit_errrrthing) include postings that show the defendant making Crips gang signs with his hands, discussing carrying firearms, and wearing blue, a color often worn by members of the gang. In the photograph below, which was posted to the defendant's account in December 2017, the defendant appears in the center of the photograph wearing a blue bandana with his arms crossed. In his comment to the right of the photograph, the defendant publicly references carrying a firearm.



B. Terror Campaign

Evidence obtained during the investigation establishes that during the period in the defendant is charged with narcotics trafficking, June 2019 through September 2019, the defendant and others affiliated with the Rollin 60s Crips participated in a terror campaign that involved the assassination of an individual by the name of Julius Caesar and the attempted murder of another individual ("John Doe") whose identity is known to the government.

1. <u>Assassination of Julius Caesar</u>

The July 8, 2019 assassination of Julius Caesar occurred in public, in broad daylight and was captured by surveillance cameras posted in and around the vicinity of one of the places the defendant and his criminal associates regularly congregated: 1666 Union Street in Brooklyn, New York. The footage is sufficiently clear to identify the defendant. It shows that prior to the assassination, the defendant was with his cousin, Terrell Winters, and others near 1666 Union Street when one of the defendant's associates, Demetrious Hedgepath, arrived with a backpack containing a loaded handgun. Hedgepath handed the backpack to Terrell Winters and then signaled to Terrell Winters by pumping his fists. As Terrell Winters placed the backpack in a car and remained nearby, the defendant and one of his affiliates spread out in a manner that shows they were looking for someone. The defendant then observed Caesar—the intended murder victim—in a car stopped at a traffic light behind other cars, after which he signaled to Terrell Winters by waiving and pointing at the victim's car. In response to the defendant's signals, Terrell Winters ran up to Casear's car and executed him by shooting him in the head through the car window. DNA evidence obtained from a gun recovered in connection with the assassination resulted in a match to Hedgepath. A copy of the video footage has been provided as Exhibit A for the Court's review.

In July and October 2019, the Kings County District Attorney's Office charged Terrell Winters and Hedgepath for their respective roles in the assassination. <u>People v. Terrell Winters</u>, Case No. 04181-2019; <u>People v. Demetrious Hedgepath</u>, Case No. 06293-2019.

2. <u>Attempted Murder of John Doe</u>

On August 3, 2019, less than one month after the killing of Julius Caesar, the defendant and others affiliated with the Rollin 60s Crips tried to assassinate another person. This time, they shot and attempted to murder John Doe.

As above, this violent act occurred in broad daylight and on a public street. It was captured by surveillance cameras posted in and around the bodega where the shooting occurred at 988 Eastern Parkway in Brooklyn, New York. The surveillance footage reveals that the defendant and others acted in concert to stalk John Doe in order to kill him. It shows that less than two minutes after John Doe left a residential building, the defendant and others began to follow him on foot. John Doe went into a bodega and, while inside, looked around in a manner that suggests he was aware that he was being followed. One of the defendant's associates then entered the bodega behind John Doe and engaged John Doe in conversation as the defendant and others fanned out on the block surrounding the entrance of the bodega, creating a lethal trap. John Doe walked out of the bodega, after which the defendant's associate followed him and blocked his path, forcing John Doe to proceed the opposite way down the block. The defendant then jumped in front of John Doe and repeatedly shot at John Doe at short range. John Doe ran and returned fire. The defendant pursued John Doe, shooting, for several blocks, after which John Doe escaped.

Cell-site data, consistent with the video footage, show that the defendant's cell phone was connected to a tower located near the bodega during the time of the shooting. In addition, investigators have determined that John Doe, who did not report the incident to the police, sought medical treatment at a hospital for a bullet wound shortly after the incident. Still images from the surveillance footage that show the defendant (circled in red) shooting at John Doe appear below. A copy of the video footage has been provided as Exhibit B for the Court's review.







II.     The Defendant's Criminal History

The defendant has previously been convicted of state criminal offenses, including prior firearm offenses.  On January 23, 2003, in the first recorded offense of which the government is aware, the defendant pled guilty to criminal trespass, a misdemeanor, for which he was sentenced to time served.  On March 19, 2004, the defendant pled guilty to attempted criminal possession of a weapon in the 2nd degree: loaded firearm, a felony, and was sentenced to 42 months' imprisonment, followed by 3 years of post-release supervision.  On October 17, 2008, the defendant pled guilty to attempted criminal possession of a weapon in the 4th degree, a misdemeanor, and was sentenced to time served.  On November 18, 2009, the defendant pled guilty to the misdemeanor of resisting arrest and was sentenced to time served.  In addition to these offenses, the defendant was also convicted on April 29, 2013, of possession of a Controlled Dangerous Substance or analog in Newark, New Jersey, for which he was fined.

III.    Legal Standard and Procedure

Under the Bail Reform Act, 18 U.S.C. § 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight.  18 U.S.C. § 3142(e).  While a finding of dangerousness must be supported by clear and convincing evidence, United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995), risk of flight can be proven by a preponderance of the evidence, United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987).

The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'"  United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).  Indeed – and significantly – danger to the community includes "the harm to society caused by [the likelihood of continued] narcotics trafficking."  United States v. Leon, 766 F.2d 77, 81 (2d Cir. 1985).

Four factors guide the Court's determination of whether a defendant should be released on bail:

(1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a . . . firearm . . .";

(2) "the weight of the evidence against the person";

(3) "the history and characteristics of the person, including . . . the person's character, . . . past conduct, . . . [and] criminal history, and record concerning appearance at court proceedings"; and

(4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

18 U.S.C. § 3142(g).

Evidentiary rules do not apply at detention hearings, and the government is entitled to present evidence by way of proffer, among other means. See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000). In the pre-trial context, few detention hearings involve live testimony or cross-examination. Most proceed on proffers. Id. at 131. This is because bail hearings are "typically informal affairs, not substitutes for trial or even for discovery." Id. (internal quotation marks omitted). Indeed, the Second Circuit has reversed district courts where they have not credited the government's proffer, including proffers with respect to a defendant's dangerousness. See, e.g., Mercedes, 254 F.3d at 437 ("Roman has twice been convicted of weapon possession – one felony conviction, and one misdemeanor conviction. We find the district court committed clear error in failing to credit the government's proffer with respect to Roman's dangerousness.").

IV.   Argument

Detention is appropriate in this case, as no bail package will protect the community from the danger posed by the defendant, and each of the four factors set forth in Section 3142(g) militate in favor of the pretrial detention.

   A.   The Defendant Poses a Danger to the Community

The defendant should be detained because he poses an ongoing danger to the community as a narcotics trafficker with a recent history of murder and gun violence.

7

First, the conduct with which the defendant is charged – trafficking crack cocaine – is serious, and the defendant faces a five-year mandatory minimum prison sentence. See 21 U.S.C. § 841(b)(1)(B)(iii). The scope and continuing nature of the defendant's criminal conduct – which includes narcotics sales on 22 occasions within a short time span, in broad daylight, on public streets, to a single customer – demonstrates that he is responsible in part for the steady supply of illicit drugs that flow through and around Brooklyn, and the significantly compromised quality of life the residents of the communities within Brooklyn suffer as a result. As noted above, the concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" Millan, 4 F.3d at 1048 (quoting legislative history). Significantly, dangerousness includes "the harm to society caused by [the likelihood of continued] narcotics trafficking." Leon, 766 F.2d at 81. That danger is particularly strong here in light of the defendant's repeated, open and notorious drug trafficking. As such, the defendant poses a danger due the likelihood that he will continue selling drugs and thereby harming society in order to make money for himself and his violent criminal co-conspirators.

Beyond the dangerousness evidenced by his narcotics trafficking, while engaged in it, the defendant and others murdered Julius Caesar and attempted to murder John Doe. In the July 2019 murder, the defendant directed the assassin to the murder victim, who was on a public street in a car surrounded by bystanders' automobiles. During the attempted murder of John Doe, only one month later, the defendant shot directly at John Doe on a public sidewalk, in broad daylight, directly in front of a bodega open to the community, while innocent bystanders were inside.

This violent campaign, in which the defendant has shown total disregard not only for the lives of his victims, but also for the safety and well-being of the law-abiding members of our community, illustrates the extraordinary danger the defendant poses to the community. Moreover, the confidence and arrogance he displayed by unleashing such violence in public, in the middle of the day, without any apparent fear of law enforcement or possible consequences, reveal the defendant to be an actor over whom the authority of the law and social norms have no sway. Significantly, the defendant has prior charges involving firearms and other weapons; those charges and the resulting periods of incarceration have failed to deter him from pursuing ongoing violent crime.

Finally, the evidence of the defendant's guilt of the narcotics trafficking with which he is charged is strong. His arrest comes at the end of a long-term investigation conducted by HSI and the NYPD that employed the use of, among other investigative techniques, extensive surveillance as well as video and audio recordings which captured the defendant in possession of both crack cocaine and drug money.

Based on these four statutory factors, as applied to the facts of the case, a finding of dangerousness is plainly warranted.

### B. The Defendant Poses a Risk of Flight

The defendant also poses a significant risk of flight given the fact that he faces a mandatory minimum sentence of five years' imprisonment. See United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight). Significantly, this appears to be the first time that the defendant has faced federal charges or a mandatory minimum sentence. Based on the defendant's profits from his crack sales and his connections to the Rollin 60s Crips gang, the defendant has myriad means at his disposal to enable his flight.

Furthermore, in January 2020, shortly after a grand jury sitting in the Eastern District of New York returned an indictment against the defendant, federal agents approached the defendant's girlfriend and mother of his children and informed her of an outstanding warrant for the defendant's arrest. The defendant subsequently fled; for more than six months, federal agents have been unable to locate him.

Where, as here, the incentive to flee is strong, no combinations of sureties and other restrictions can assure a defendant's appearance. See generally United States v. English, 629 F.3d 311, 321-22 (2d Cir. 2011) (affirming detention in part because the defendant was charged under § 924(c), faced a presumption against release and a mandatory minimum sentence that incentivized fleeing); United States v. Henderson, 57 F. App'x 470, 471 (2d Cir. 2003) (summary order) ("the presumption regarding flight risk has changed because Becton now faces a ten-year mandatory minimum sentence"). That remains true even if the defendant accepts electronic surveillance and home confinement. See United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology") (internal quotation marks omitted).

### V. Conclusion

For the reasons set forth above, the government respectfully requests the Court order the defendant detained pending trial.

Respectfully submitted,

SETH D. DUCHARME
Acting United States Attorney

By: /s/ *Gillian A. Kassner*
Gillian A. Kassner
Assistant U.S. Attorney
718-254-6224

cc: Clerk of Court (by email)
Defense Counsel (by email)